1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUDY ALMAZAN, | Case No. 1:13-CV-001172-SMS |
| Plaintiff, | |
| v. | ORDER GRANTING PLAINTIFF'S SOCIAL SECURITY APPEAL AND REMANDING ACTION FOR FURTHER ADMINISTRATIVE PROCEEDINGS |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | (DOC. 1) |

        Plaintiff Rudy Almazan, by his attorneys, Frailing, Rockwell, Kelly & Duarte, LLP, seeks

judicial review of a final decision of the Commissioner of Social Security ("Commissioner")

denying his application for disability insurance benefits ("SSDI") pursuant to Title II, and for

supplemental security income ("SSI") pursuant to Title XVI of the Social Security Act (42 U.S.C. §

301 *et seq.*) ("the Act").  This action was initially referred to the undersigned pursuant to Local Rule

302(c)(15), and both parties voluntarily consented to proceed before a United States Magistrate

Judge for all purposes.  *See* 28 U.S.C. § 636(c).  The matter is before the Court on the parties' cross-

briefs, which were submitted without oral argument.  Following a review of the complete record and

applicable law, the Court finds the decision of the Administrative Law Judge replete with legal error

and not supported by substantial evidence.

1

**BACKGROUND**

## I. Procedural History

On March 19, 2009, Plaintiff applied for SSDI and SSI benefits.  Plaintiff alleges onset of disability on January 15, 2007.  The Commissioner initially denied the claims on September 22, 2009, and upon reconsideration again denied the claims on February 17, 2010.  On April 19, 2010, Plaintiff filed a timely request for a hearing.

On May 18, 2011, and represented by counsel, Plaintiff appeared and testified at a hearing presided over by Laura Speck Havens, the Administrative Law Judge ("ALJ").  *See* 20 C.F.R. § 404.929 *et seq.*  An impartial vocational expert, Stephen B. Schmidt, telephonically appeared and testified.

On September 22, 2011, the ALJ denied Plaintiff's application.  The Appeals Council denied review on May 28, 2013.  The ALJ's decision thus became the Commissioner's final decision.  *See* 42 U.S.C. § 405(h).  Plaintiff filed a complaint on July 26, 2013, seeking this Court's review pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).

## II. Administrative Record[1]

### A. Plaintiff's Hearing Testimony[2]

Plaintiff testified to the following at the May 18, 2011 hearing.  Plaintiff, born August 24, 1963, was homeless and using his sister's address in Modesto, eating at a Salvation Army, and bathing at a local community college.  Plaintiff reported that the remainder of his family had moved to San Diego.  Plaintiff had one minor daughter in foster care.  Plaintiff did not complete high school, but received his GED and was able to communicate in English.  Plaintiff testified that he last

---

[1] Plaintiff does not contest the ALJ's findings regarding his physical functional capacity or the weighing of his credibility.  Therefore, the Court summarizes only the disputed medical evidence relevant to Plaintiff's mental condition, as well as the vocational evidence.

[2] AR 30-41.

worked in 2007 as a general laborer through a temporary agency, but was not currently working and had not worked since 2007.

Plaintiff alleged onset of disability in 2007 due to testicular cancer, back pain, arthritis, and depression.  Plaintiff testified that he stopped working because "that's when I caught cancer." Plaintiff stated that his depression prevented him from working because he could not concentrate, and told the ALJ that he was "having a hard time right now [at the hearing]."  He testified that he experienced sharp pain that "comes and goes" in his shoulders, legs, knees, and lower back.  Plaintiff had the following exchange with the ALJ:

Q    On a scale of 1 to 10, with 10 being the worst level of pain, what average number would you put the pain at with the medication you take?

A    I didn't get what you said.

Q    On a scale of 1 to 10, with 10 being the very worst pain, like a car accident or a broken bone or something like that, what number would you put the pain at with the medication that you take on an average?

A    Like, this morning my knee was killing me.

Q    Okay. Listen to my question again.

A    Huh?

Q    Listen to the question.  On an average, what number would you put the pain at, 1 to 10?

A    Probably an 8.

Q    Okay. That's with the medication, correct?

A    [No verbal response.]

Q    Is that a yes?

A    Yeah.

 Plaintiff reported that he took Tramadol, Neurontin, Prevacid, Lipitor, as well as other prescriptions, but that he could not remember all of them and his attorney did not have a list of at the

hearing.  Plaintiff stated that he believed his cancer was then in remission, and he received follow-up care for ongoing determinations once every three to six months.

Plaintiff testified that the most weight that he could lift was ten pounds.  He testified that he could ride his bike "about an hour" or "maybe half hour.  You know, it depends."  Plaintiff estimated that he could sit for 40 minutes, but "not that long because it hurts my back."  He stated that he had trouble sleeping at night because of his shoulder pain, and also couldn't sleep on his back "ever since I hurt [it]."

Plaintiff described that on a typical day he wakes up in the morning after an average five hours of sleep, puts away his sleeping bag, and then goes to the bus station where he sits inside for warmth and talks to friends.  Though he did not have a car, Plaintiff maintained his driver's license. Plaintiff stated that he used public transportation such as the bus, but primarily rode his bike for transportation.  Plaintiff testified that he did not currently drink alcohol or use drugs, having stopped on July 23, 2010, approximately ten months before the hearing.  Plaintiff reported going to Alcoholic Anonymous meetings, and though he did not have a sponsor, was seeking one.  Plaintiff alleged mental impairments and testified that he was regularly seeing a mental health professional, David Sandoval, a licensed clinical social worker at Paradise Medical Center, for counseling.

**B.  Vocational Expert Testimony[3]**

Stephen B. Schmidt testified as a vocational expert ("VE") at the May 18, 2011 hearing.  The VE classified Plaintiff's past relevant work as a general laborer as "construction worker II" at Specific Vocational Preparation ("SVP") level 2.  *See* DOT Code 869.687-026.  The VE noted that the position was ranked by the DOT as "very heavy" exertional level, but because Plaintiff lifted a maximum of only 10 pounds on the job, it would be considered "light" exertional level as actually performed. *See* SSR 85-15.

---

[3] AR 41-44.

4

The ALJ posed the following hypothetical to the VE:

Assume a person of claimant's age, which is now 47, with an 11th grade – I'm sorry – high school equivalent education, and the same past relevant work with the following additional restrictions present: the hypothetical person can sit six hours out of an eight-hour day; can stand for two hours out of an eight-hour day; can walk for two hours out of an eight-hour day; can occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds, can occasionally climb stairs; never climb ladders; occasionally balance, kneel, crouch, and crawl.  Additionally, the hypothetical person must avoid concentrated exposure to heights and moving machinery.  Additionally, the hypothetical person has mental restrictions of the following: the hypothetical person is able to understand, remember, carry out simple job instructions only.  With these restrictions, could a person do the job as performed by Mr. Almazan in the past?

The VE responded that such an individual could *not* return to Plaintiff's past relevant work.

The VE testified that the hypothetical individual could perform a limited range of unskilled, sedentary level job with an SVP of 2, such as "assembly" (DOT code 726.684-110), with 4,000 positions in California, as well as "information clerk" (DOT code 237.367-046), with 11,000 positions in California, and "inspector" (DOT code 726.684-050), with 2,000 positions in California, though did not supply the respective numbers available in the national economy.  He testified that his testimony was consistent with the DOT.

Plaintiff's attorney posed the following hypothetical to the VE:

Please assume the hypothetical person has the same age and education as the claimant.  Additionally, he is able to sit six hours out of an eight-hour day; stand/walk two hours out of an eight-hour day.  However, he cannot accept instructions from supervisors or interact with the coworkers and public; unable to perform work activities on a consistent basis without special or additional instruction; could not maintain regular attendance in the work place.

In response, the VE testified that such an individual would *not* be able to perform the three previous examples of unskilled, sedentary work, or any other work.

//

//

//

//

//

5

### C.  Medical and Mental Health Evidence

The following medical and mental health records and opinions were properly before the ALJ.

#### 1.  2008-09: Radiation Oncology[4]

On March 10, 2008 at Doctor's Medical center, Dr. Beck performed "radical orchiectomy on the right side for a hard, firm mass suspicious for cancer."  Pathology confirmed "pure seminoma with vascular invasion."  In medical records dated May 16, 2008, radiation oncologist, Peter Sien, M.D., wrote, "The patient has been abstained from alcohol for 9 months, as he claimed. Yesterday he was on a beer binge and ended up in the emergency room in the hospital for evaluation because he has nausea, vomiting, and abdominal pain."  On June 30, 2008, Dr. Sien noted that Plaintiff had completed a course of postoperative prophylactic radiation therapy after he had right radical orchiectomy.  Plaintiff received follow up care for testicular cancer at Prigge Radiation Oncology Center in Modesto.  Medical records from 2009 show that Plaintiff presented with right testicular seminoma, stage I, post orchiectomy and prophylactic radiation therapy.  In radiation oncology follow-up evaluation notes dated October 8, 2009, Dr. Sien wrote that Plaintiff would continue his future follow up visits with his primary physician at Paradise Clinic where "he should have a blood test to monitor his serum marker."

#### 2.  June 2009: Psychiatric Review[5]

In a psychiatric review technique form dated June 17, 2009, A. Garcia, M.D., reported that she had "insufficient evidence" to determine Plaintiff's medical disposition.  She left blank the remainder of the form.

#### 3.  June 2009: Urine Drug Abuse Screen[6]

On June 24, 2009, Dr. G. Webb-Kummer, M.D., received lab results from Plaintiff's urine drug abuse screen as part of his post-operative follow-up regimen.  The results were "Negative" as to

---

[4] AR 350-56.
[5] AR 270-80.
[6] AR 374.

all drugs for which Plaintiff was tested, including: amphetamines, barbiturates, benzodiazapines, cocaine, opiates, phencyclidine, propoxyphene, cannabinoids.

### 4.   July 2009: Psychiatric Evaluation by Dr. Libunao[7]

State agency psychiatric consultant and Board eligible psychiatrist, Gene Libunao, M.D., examined Plaintiff on July 24, 2009, and performed a comprehensive psychiatric evaluation.  He also reviewed Plaintiff's disability form SSA-3368.  In his five-page written report, Dr. Libunao noted that Plaintiff was asleep in the waiting room when called.  Dr. Libunao observed that Plaintiff had adequate grooming, hygiene, and dress.  He noted that Plaintiff presented with a neutral attitude and his behavior was cooperative; answered questions directly at times, though tangentially at times; and his speech was of normal volume, rate, and tone.  Plaintiff reported depressed mood, variable sleep and appetite, poor concentration and poor energy.  He also reported hearing voices and "medicat[ing] himself" with beer because "it makes the voices more bearable."  During the examination, Plaintiff denied any auditory and visual hallucinations.  Plaintiff reported that he "is currently drinking two 32-ounce beers every day," and has stopped attending AA meetings.  Dr. Libunao observed that Plaintiff was a poor historian.

Dr. Libunao documented Plaintiff's medical history as follows: testicular cancer in remission, rotator cuff injury, back problems, thumb injury, metal rod in right tibia, and knee arthritis.  Dr. Libunao listed Plaintiffs current medications as Vicodin, Baclofen, Lipitor, Prevacid, and Naproxen.  Dr. Libunao noted that Plaintiff reported having been "hit by a car as a pedestrian, once on foot, and once on a bike, 1994."

As to Plaintiff's psychiatric history, Dr. Libunao noted that Plaintiff denied any history of psychiatric hospital admissions; had no outpatient psychiatric treatment; denied suicide attempts, but admitted to suicidal ideations while in jail, for which he was placed in a safety cell.  Dr. Libunao observed no visible response to internal stimuli and Plaintiff denied current auditory and visual

---

[7] AR 286-90.

hallucinations, and reported no suicidal or homicidal ideations.  Dr. Libunao noted that Plaintiff's

mood was "depressed and tired," affect was full, and he was oriented to month, year, and city.  In the

"Current Level of Functioning" section, Dr. Libunao wrote:

**CONCENTRATION, PERSISTENCE, & PACE**
Concentration was poor during the interview. The claimant was persistent with all questions. Pace during the interview was uneven with tangential thought process, and at times, seems to take the interview not seriously.

**DSM-IV DIAGNOSIS:**
Axis I:       Alcohol dependence. Depressive Disorder NOS.
Axis II:      Deferred
Axis III:     Deferred
Axis IV:      Moderate, chronic substance abuse, limited social support, poor coping skills, financial stressors.
Axis V:       GAF 55.

**DISCUSSION/PROGNOSIS:** The claimant's psychiatric symptoms are treatable. His condition can improve within the next 12 months with multidisciplinary treatments.

**FUNCTIONAL ASSESSMENT/MEDICAL SOURCE STATEMENT:** The following opinions are based on a psychiatric evaluation conducted on July 24, 2009.

The claimant is not capable of managing his own funds.

The claimant does have the ability to perform simple and repetitive tasks, but not detailed and complex tasks.

The claimant cannot accept instructions from supervisors and interact with coworkers and the public.

The claimant cannot perform work activities on a consistent basis without special or additional instruction.

The claimant cannot maintain regular attendance in the workplace.

The claimant cannot complete a normal workday/workweek without interruptions from a psychiatric condition.

The claimant cannot deal with the usual stress encountered in a competitive work environment.

//

5.   August 2009: Dr. Garcia's Assessment[8]

Dr. Garcia filled out two Mental Residual Functional Capacity Assessment ("MRFCA") forms dated August 26, 2009.[9]  She first completed the form considering the impact of DAA on Plaintiff's impairments, and opined that Plaintiff would be unable to sustain simple, repetitive tasks and relate or adapt to work changes.  The form is predominately a checklist and as to Plaintiff's functional memory and concentration, Dr. Garcia checked the boxes for "Markedly Limited" next to two categories: (1) ability to understand and remember detailed instructions, and (2) ability to carry out detailed instructions.[10]  She rated Plaintiff as "Moderately Limited" in 13 other functional categories.

In the second MRFCA form, Dr. Garcia considered Plaintiff's impairments *without* DAA and opined that, in this circumstance, he would be able to sustain simple, repetitive tasks with adequate pace and persistence, relate to others, and adapt to customary work pressures. AR 324-26.  She checked no boxes for "Markedly Limited" functional categories, and checked boxes for only two categories in which she considered Plaintiff "Moderately Limited": (1) ability to understand and remember detailed instructions, and (2) ability to carry out detailed instructions.  She typed "Agree" next to a case note stating that Plaintiff's "DAA appears material [to] our decision," and he "should be able to sustain SRT [simple, repetitive tasks] if he abstained from ETOH abuse."

On the same date, Dr. Garcia completed a new psychiatric review technique form, reporting Plaintiff's medical disposition by checking the box for "RFC Assessment Necessary." AR 310-20.

---

[8] AR 321-29.

[9] The mild, moderate, or severe limitations in the broad categories of "activities of daily living" that are assessed as part of the psychiatric review technique, such as maintaining social functioning, "are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process." SSR 96–8p, *available at* 1996 WL 374184; *see also Rogers,* 490 Fed.Appx. at 17–18 (moderate impairments assessed on a psychiatric review technique form "in broad functional areas used at steps two and three" did not equate to concrete work-related limitations for RFC; rather, "the RFC assessment adequately captures restrictions in broad functional areas if it is consistent with the concrete limitations in the medical opinions").

[10] AR 321-23.

She checked a box stating "[a] medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above," describing it as "Depressive Disorder NOS." She listed an additional disorder as "ETOH Dependence." Rating Plaintiff's functional limitations for "B" Criteria, she specified that "without alcohol," Plaintiff had the following "Mild" limitations: restriction of activities of daily living; difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace.

### 6. November 2009: Oncology Consultation[11]

At a November 4, 2009 oncology appointment, Michael Williams, M.D., Ph.D., performed a physical exam, took Plaintiff's medical history, and addressed issues relating to Plaintiff's follow-up care. In his consultation notes, Dr. Williams wrote that, "Mr. Almazan is an alcoholic, self-admitted and brought beer in with him today for his consultation visit."

### 7. February 2010: Case Analysis by A. Garcia, M.D.[12]

In a two-page "Case Analysis," dated February 3, 2010, Dr. Garcia briefly summarized the medical records and recommended that the Commissioner "affirm the prior initial decision." The form includes a note that Plaintiff had reported drinking "all the time." Dr. Garcia concluded that, "DAA does not appear to be material."

### 8. 2010-11: Counseling by Licensed Clinical Social Worker[13]

Plaintiff had been under the care of a Licensed Clinical Social Worker ("LCSW"), David Sandoval, from approximately February 2010 to February, 2011. After each 30-minute "face-to-face" session, the LCSW produced type-written treatment notes. About the February 22, 2010 session with Plaintiff, the LCSW wrote the following evaluation:

**Assessment:** Patient came in today after referral from Dr. Webb-Kummer. Patient stated that he is currently homeless. He has been seen in the past and at that time would not give a lot of information. Patient still somewhat guarded today. He stated that he does not have anyone

---

[11] AR 380-82.
[12] AR 401-02.
[13] AR 430-51.

here that he can really stay with. He has family but they mostly live in San Diego, CA. Patient stated that he has a brother who lives here in Modesto, but that he does not get along with his brother's "son in law." **Current symptoms:** Patient reports a lot of depression. He stated that he does not open up to people. He has goals but no motivation. He did not finish high school. Patient reports being worried he may die in his sleep. **Psych Hx**: This is unknown at present, but patient may have a previous history that he is not disclosing. When asked he denied any psych[ological] treatment. Patient did say that he sometimes hears voices that tell him he is a loser, etc. These voices are mostly negative. Although later patient stated that he was told by a relative that he needs to see a Dr. because Schizophrenia runs in the family (patient has a brother and sister with that Dx). **Family/Social/Substance:** Patient stated that he had alcohol problems in the past. That he has been to SRC and Reality a total of 4 times. He stated that he has an 8-year old daughter that he is worried about and that he does not want to give too much history as he hopes to see her more and maybe get custody (?). Patient stated that he was hit by a car in '95 and was in the hospital[;] they put a rod in his leg and he says he had a head injury. He stated that he was hit again in August 2008 while on a bike. Patient is still drinking, but says not very much maybe "a beer a day." Patient states that he is not interested in a program but later says that "I hate myself." There are a lot of things that need to be looked at with patient.

The LCSW listed Plaintiff's diagnosis as "Substance Abuse Issues, Psychosis NOS." His recommendations and behavioral change plans included seeing Plaintiff "one more time, then plan to have patient evaluated by Dr. Chua for Dx [diagnosis] and treatment." The LCSW recommended that Plaintiff return for another appointment "in 2-3 weeks."

The LCSW next saw Plaintiff on March 8, 2010, about which he wrote the following:

Today he is still a little unfocused. I tried to see if there was any other Mental Health hx [history] from patient, although he denies that there was anything. Then later patient stated that he may have seen someone in 1996 but that he could not remember if that was true. Today patient stated that he has had about 50 drunk in public situations with law enforcement. . . . Patient has relatives but cannot stay with them because of a problem 20 years ago of lewd conduct with a minor. He stated that he had been drinking and had used some drugs and that he was fighting off people in his dreams and that there was a problem with a relative. He has also had a domestic violence case in the past. Patient stated that in the 90s he hit his head hard on the concrete and "may have passed" out losing consciousness. Patient stated that he started to drink around age 17 and that none of his relatives want hi[m] around unless he is sober. Patient could not give exactly the amount that he drinks daily, but it is around 2-3 cans per day (32 oz). Patient stated that he has a GED. He is not sure that he can work because his "back is messed up." He also stated that he has been treated for testicular cancer. Plan to call patient with an appointment after discussion with his physician.

The LCSW listed Plaintiff's diagnosis as "Substance Abuse Alcohol Dependence 303.9." His recommendations and behavioral change plans were, "patient to follow up with me. Discuss with Dr. Webb-Kummer as well."

11

The LCSW again met Plaintiff for a 30-minute session on April 26, 2010, writing in part:

[ . . . ] He was clearly responding to internal stimuli today during the interview. He looked over his shoulder a few times and then he would laugh or respond. When asked what was going on he mentioned finally that he hears voices, but that he did not want anyone to know that because they might "lock me up." Patient stated that he has a sister and a brother who have a diagnosis of Schizophrenia, but he was not completely sure about that. He stated that part of the reason that he drinks is that it is easier to ignore the voices when he is drinking. He stated that the voices usually tell him that he is a loser, that he is worthless and is no good. He stated that he does not want people to think that he is crazy either. He is still drinking, but stated that it has not been everyday it is about 3-4 times a week. He stated that he is not sure what to do, but that he has thought of applying for SSI because his brother has told him to do that because he is "crazy." Given this new information will make referral for a psych consult.

The LCSW listed Plaintiff's diagnoses as "Alcohol Dependence," and "R/O psychosis NOS." His written recommendations and behavioral change plans included sending "[p]atient to see Dr. Chua for consult and treatment recommendations. He has been seen in the past, but never disclosed hearing voices." The LCSW recommended that Plaintiff continue his sessions.

The next session form in the record is dated July 6, 2010, wherein the LCSW wrote in part:

[ . . . ] He was laughing at times during the time he was seen as though he was responding to external stimuli. Patient was asked and he then would make eye contact and say that there was nothing it was just "the voices." He stated that he is learning to make friends with them. Patient stated that he has thought about returning to San Diego, but that he really needs to go through treatment and then he stated that he was not sure what he is going to do. Patient was encouraged to follow through with SRC.

The LCSW listed Plaintiff's diagnosis as "Alcohol Dependence." His recommendations and behavioral change plans included additional follow-up sessions.

The LCSW's next behavioral health progress notes in the record are dated October 5, 2010, wherein he wrote that Plaintiff was doing "a little bit better." He also observed that Plaintiff "has been sober several months," and "is attending AA groups." He reported Plaintiff's continued focus on custody issues related to his daughter. The LCSW wrote, "He stated that he still hears voices but he does not like to tell that to anyone because he is afraid it will cause him problems." At that date, the LCSW listed Plaintiff's diagnosis as "Alcohol Dependence, 303.9," and "Alcohol induced psychosis." Written recommendations and behavioral change plans included continued counseling.

About the LCSW's November 18, 2010 session with Plaintiff, he wrote in part:

**[ . . . ]** He is still hearing voices but is guarded about talking about that because he believes that it will affect his ability to have custody of his daughter. He has not been drinking now for over 120 days. He stated that he feels better physically. He feels more stable as well. He has seen Dr. Chua in the past but is not sure he wants to be seen again at present. He has a court date in March about custody. He stated that he thinks that his mother and sister in San Diego may also file for temporary custody in order to help him. Patient is going to Bible study classes and stated that has also been helpful.

The LCSW listed Plaintiff's diagnosis as "Alcohol dependence in remission."  His recommendations and behavioral change plans included a continued plan to see patient for counseling.

At another follow-up session with Plaintiff on December 3, 2010, the LCSW wrote in part:

**[ . . . ]** He stated that he is still hearing voices at times. He does not want people to know that though because of his concerns about his daughter. Patient still wants to have custody of his daughter and stated that he thinks his Ex is going to lose her housing. He has seen Dr. Chua in the past and no meds were recommended, but I spoke with Dr. Chua today and he said with patient having 4 months of sobriety let's consider another consult in another month. Patient is in agreement with that plan. He feels like he is improving. He has been going to AA meetings all the time. He completed a parenting class at Sierra Vista as well. Patient seems about the same with his depression except for doing much better with his sobriety.

The LCSW listed Plaintiff's diagnosis as "Alcohol dependence in partial remission (4+ months)." His written recommendations and behavioral change plans included a continued plan to see patient for counseling.

Dated December 17, 2010, the LCSW's next evaluation form includes:

[ . . . ] He was complaining of hurting his back today and that he is not sure how it happened. Patient was walking slow and very deliberately today. He stated that he saw Dr. Sharmoukh this morning as well. Patient stated that he is taking all of his medications and that recently he had a "hair follicle test" that was part of the plan for him to have custody of his daughter. He stated that currently he has limited visitation and only sees her every 2 weeks. He does not think that there are any medications that are helping with the "voices." He has been sober now for 5+ months and stated that the reason that he used to drink was because it helped with tolerate the "voices." He stated that when he is talking with others he responds less, but when he is alone he will talk to himself and the "voices" more. He stated today that the[] "voices" tell him he is not going to see [his] daughter or "get" her, they try to put him down more. He was very distracted today and stated it is because he is really tired and having more back pain. [ . . . ]

13

At that point, the LCSW listed Plaintiff's diagnoses as "Psychosis" and "Depression."  Behavioral

change plans and recommendations included scheduling Plaintiff for "Behavioral Health," and for

follow up counseling.

On January 7, 2011, the LCSW met with Plaintiff again, about whom he wrote in part:

> [ . . . ] He is currently clean from alcohol for over 5 months. He stated that he is still hearing voices and that they tell him the following: 1-you are not going to make it, 2-you are not going to get your daughter back, 3-you will never be able to stop drinking. Patient stated that he has been able to do that and he was congratulated on that accomplishment. Patient is going to celebrate recovery at the church and he feels like that is helping him.

After the early January session, in addition to diagnosing alcohol dependence, the LCSW now listed

a diagnosis of "298.9 Psychosis, nos."  Recommendations and behavioral change plans included

continued counseling and a possible additional consultation with Dr. Chua "in order to see if

treatment is indicated at this time."

After another session with Plaintiff on January 21, 2011, the LCSW wrote in part:

> [ . . . ] He is attending church and also has a sobriety group that he attends. He stated that he still hears voices and that they tell him that he will never be able to stay sober, that he is not going to get his daughter and other negative things. Then patient stated that there are times when they are funny, too. Patient stated that they bother him but that he knows that he has too much to lose by listening to them.  [ . . . ]

The LCSW again listed Plaintiff's diagnosis as "Alcohol dependence 303.9 in partial remission (6

months)," as well as "Psychosis NOS 298.9."  His recommendations and behavioral change plans

included continuing the counseling every 1-2 weeks.

The LCSW met with Plaintiff on February 9, 2011, about whom he wrote in part:

> [ . . . ] He stated that he is still hearing voices at times. He stated that it has been about the same. [ . . . ] Patient a few times when here would stop mid sentence and act as though he was hearing things. When asked he stated that it was "the voices" and that he usually [tries] to ignore them. He has been going to meetings and maintaining his sobriety . . . .

The LCSW again listed Plaintiff's diagnoses as "298.9 Psychosis, nos," as well as "303.90 Alcohol

dependence in full remission."  The LCSW's recommendations and behavioral change plans

included seeing Plaintiff again in "2-3 weeks."

14

Notably absent from the administrative record are any mental health records from Dr. Chua. The Plaintiff did not supply any medical source statement from a treating psychiatrist or psychologist.

9. August 2011: Physical Assessment by Dr. Yusufzie[14]

At the request of the State agency, consultative board certified family practice physician, Kamalullah Yusufzie, M.D., examined the Plaintiff on August 10, 2011. Dr. Yusufzie performed a complete physical evaluation. Dr. Yusufzie listed Plaintiff's chief complaints as low back and leg pain. Dr. Yusufzie noted that Plaintiff's current medications were Tramadol, Bactrim, Keflex, Nexium, Neurontin, Lipitor and Ibuprofen. Plaintiff reported that his pain started after being hit by a car in 1995. Dr. Yusufzie listed a history of right testicular cancer, status-post right orchietomy, dyslipidemia, allergies, gastroesophageal reflux disease, seborrheic dermatitis, and schizophrenia. Dr. Yusufzie noted that Plaintiff "does not smoke, drink, or use any other drugs." In the report's "General Findings" section, Dr. Yusufzie wrote:

> There is an old surgical scar on lower extremities above the knee and on the left tibia-fibula bones but it is pretty-well healed. No abnormality has been seen. He is constantly talking to himself while I was examining him, and he told me that he is hearing voices and he is talking to the voices.

In conclusion, Dr. Yusufzie wrote that Plaintiff's low back and leg pain were "normal." Although Dr. Yusufzie acknowledged that she would "defer the functional assessment of this disorder to a mental health specialist," the doctor included a diagnosis for "Schizophrenia," and "actively psychotic, hearing voices."

10. August 2011: Psychological Assessment by Dr. Dixit[15]

On August 19, 2011, Plaintiff saw psychologist Aparna Dixit, Psy.D., a consultative examiner who conducted a psychological disability evaluation at the request of the California Department of Social Services. Dr. Dixit observed Plaintiff to be appropriately dressed with

---

[14] AR 456.
[15] AR 464-466.

adequate hygiene and grooming, and his speech was spontaneous.  Dr. Dixit noted that Plaintiff's

chief complaints were "problems due to car accident," and "auditory hallucinations."  Dr. Dixit

considered Plaintiff to be an unreliable historian with regard to his substance abuse history.  Plaintiff

reported to Dr. Dixit that he had previously been arrested for domestic violence and a sex offense.

Dr. Dixit listed Plaintiff's then-current medications as Neurontin, Tramadol, and Nexium.  Dr. Dixit

reported having reviewed Dr. Libunao's comprehensive psychiatric evaluation from July 2009, but

no other medical or mental health records.  Dr. Dixit took Plaintiff's medical and mental health

history, about which she wrote the following:

> History of Present Illness: The claimant reported that he has been suffering from auditory
> hallucinations and physical problems since a car hit him in the mid 1990s. He said that his
> physical problems include bad rotator cuffs, pain in his right leg, and back pain. He added
> that he was diagnosed with testicular cancer three years ago.
> …
> Past Psychiatric History: The claimant said that he is currently attending counseling. He said
> that he has never had psychiatric hospitalizations. The claimant reported that he has never
> been prescribed psychiatric medication. When asked if he had ever attempted suicide, the
> claimant said that he did not like talking about it, but said that [he] is not currently suicidal.
> …
> Substance Abuse: The claimant reported that he last drank alcohol one year ago and has used
> cannabis in the past. Documents in the claimant's chart indicated that the claimant has a
> history of methamphetamine, cocaine, PCP, and alcohol abuse.

In a separate section giving her psychological assessment, Dr. Dixit wrote:

> **MENTAL STATUS EVALUATION**
> [ . . . ]
> Content of Thought: The claimant was coherent. There was no evidence of psychosis. No
> current suicidal or homicidal ideation noted.
>
> Mood and Affect: The claimant's mood was dysthymic and his affect was commensurate
> with his mood.
>
> **INTELLECTUAL FUNCTIONING AND SENSORIUM**
> Orientation: The claimant was oriented to time, place, purpose, and person.
>
> Memory: The claimant was able to remember 3 out [sic] 3 objects immediately and 3 out of 3
> objects in 3 minutes.
> [ . . . ]
>
> **FOLSTEIN MINI-MENTAL EXAM**
> The claimant scored 30 out of 30.

16

**Diagnostic Impressions**

| | |
|---|---|
| Axis I: | Major Depressive Disorder NOS |
| | Polysubstance Dependence |
| Axis II: | Diagnosis Deferred |
| Axis III: | Deferred to medical opinion |
| Axis IV: | Unemployment |
| Axis V: | GAF = 58 current |

In conclusion, Dr. Dixit wrote:

> The claimant would benefit from a medical evaluation for his reported medical issues. He would benefit from psychiatric treatment.
>
> From a psychological standpoint, the claimant can understand, remember, and carryout [sic] simple instructions and should have no difficulty with remembering and carrying out detailed and complex instructions. He would have no significant difficulty dealing with the public. The claimant will have no significant difficulty interacting and relating to co-workers and supervisors. The claimant had no difficulty maintaining his attention and concentration during this evaluation.
>
> **FUNDS**
> Due to his history of substance use, the claimant would benefit from assistance in managing his funds in his best interest.

Dr. Dixit also completed a form titled "medical source statement of ability to do work-related activities (mental)" form, wherein she answered questions primarily by checking boxes.[16]  In question one, she checked "None" by each of the following: is ability to understand, remember, and carry out instructions affected by the impairment; understand and remember simple instructions; carry out simple instructions; the ability to make judgments on simple work-related decisions; understand and remember complex instructions; carry out complex instructions; the ability to make judgments on complex work-related decisions.  When asked to identify factors such as particular medical signs, laboratory findings, or other factors that supported her assessment, Dr. Dixit hand wrote "mental status evaluation, behavior observations."  On the next line she wrote, "R/O malingering, [claimant] appeared to be exaggerating symptoms. Did have an inconsistent symptom presentation." Dr. Dixit checked "No" when asked "is [claimant's] ability to interact appropriately with supervision, co-workers, and the public, as well as respond to changes in the routine work

---

[16] AR 467-69.

setting, affected by impairment?"  Where the choices were "none," "mild," "moderate," "marked,"

or "extreme," Dr. Dixit checked "None" next to each of the following: interact appropriately with

the public; interact appropriately with supervisors; interact appropriately with co-workers; respond

appropriately to usual work situations and to changes in a routine work setting.  To identify the

factors (such as particular medical signs, laboratory findings, or others) that supported her

assessment, she wrote "mental status evaluation. Behavior observation. Claimant had an inconsistent

symptom presentation."  Answering whether any other capabilities were affected by the impairment,

Dr. Dixit checked "No."  Question five asked, "if the claimant's impairment(s) include alcohol

and/or substance abuse, do these impairments contribute to any of the claimant's limitations as set

forth above? If so, please identify and explain what changes you would make to your answers if the

claimant was totally abstinent from alcohol and/or substance use/abuse."  Dr. Dixit hand wrote her

answer: "claimant has a significant history of substance use which may or may not have impacted

his reported psychosis."  The form's final question asked whether the claimant could manage

benefits in his own best interest, and Dr. Dixit checked "No," then wrote, "due to significant history

of substance use."

## LEGAL STANDARD

An individual is considered disabled for purposes of disability benefits if he is unable to

engage in any substantial, gainful activity by reason of any medically determinable physical or

mental impairment that can be expected to result in death or that has lasted, or can be expected to

last, for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)

(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003).  The

impairment(s) must result from anatomical, physiological, or psychological abnormalities that are

demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of

such severity that the claimant is not only unable to do her previous work but cannot, considering her

age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability.[17]  20 C.F.R. §§ 404.1520(a)-(f); 416.920 (a)-(f).  In the first-step analysis, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b). If not, in the second step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities.  *Id.* §§ 404.1520(c), 416.920(c).  If so, in the third step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments, 20 C.F.R. § 404, Subpart P, App. 1.  *Id.* §§ 404.1520(d), 416.920(d).  If not, in the fourth step, the ALJ must determine whether the claimant has sufficient RFC, despite the impairment or various limitations to perform his past work.  *Id.* §§ 404.1520(f), 416.920(f).  If not, in step five, the burden shifts to the Commissioner to show that (1) plaintiff can perform other substantial gainful activity and (2) a "significant number of jobs exist in the national economy" which plaintiff can perform. *Id.* §§ 404.1520(g), 416.920(g); *Kail v. Heckler,* 722 F.2d 1496, 1498 (9th Cir. 1984); *Tackett v. Apfel,* 180 F.3d 1094, 1099 (1999).

Plaintiff has the burden of showing that drug and alcohol addiction ("DAA") is not a contributing factor material to disability. *Ball v. Massanari,* 254 F.3d 817, 823 (9th Cir. 2001). The Act bars payment of benefits when drug addiction and/or alcoholism is a contributing factor material to a disability claim. 42 U.S.C. §§ 423(d)(2)(C) and 1382a(3)(J); *Bustamante v. Massanari,* 262

---

[17] In the five-step sequential review process to determine whether a claimant qualifies as disabled, the burden of proof is on the claimant at steps one through four, but shifts to the Commissioner at step five.  *See Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999).  If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Id.* at 1098–99; 20 C.F.R. §§ 404.1520, 416.920.

F.3d 949 (9th Cir. 2001); *Sousa v. Callahan,* 143 F.3d 1240, 1245 (9th Cir. 1998).  If there is

evidence of DAA and the individual succeeds in proving disability, the Commissioner must

determine whether substance abuse is a contributing factor material to the determination of

disability. 20 C.F.R. §§ 404.1535 and 416.935.  If the ALJ finds that the claimant is not disabled,

then the claimant is not entitled to benefits and there is no need to proceed with the analysis to

determine whether substance abuse is a contributing factor material to disability.  However, if the

ALJ finds that the claimant is disabled, then the ALJ must proceed to determine if the claimant

would be disabled if he or she stopped using alcohol or drugs.

## DISCUSSION

### I.      Scope of Review

Congress has provided a limited scope of judicial review of the Commissioner's decision to

deny benefits under the Act.  Pursuant to 42 U.S.C. § 405(g), this Court may set aside the

Commissioner's denial of social security benefits when the ALJ's findings are based on legal error or

not supported by substantial evidence in the record as a whole. *Bayliss v. Barnhart,* 427 F.3d 1211,

1214 (9th Cir. 2005).  The record as a whole must be considered, weighing both the evidence that

supports and the evidence that detracts from the Commissioner's decision.  *Lingenfelter v. Astrue*,

504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).  In weighing the

evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g.,*

*Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  If an ALJ applied the proper legal

standards and the ALJ's findings are supported by substantial evidence, this Court must uphold the

ALJ's determination that the claimant is not disabled.  *See, e.g., Ukolov v. Barnhart*, 420 F.3d 1002,

104 (9th Cir. 2005); *see also* 42 U.S.C. § 405(g).  Substantial evidence means "more than a mere

scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1998 (9th Cir.

2008).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Burch*, 400 F.3d at 679.  The ALJ is responsible for determining credibility, resolving

conflicts in medical testimony, and resolving any other ambiguities that might exist. *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995).  Where the evidence as a whole can support either outcome, the Court may not substitute its judgment for the ALJ's, rather, the ALJ's conclusion must be upheld.  *Burch v. Barnhart,* 400 F.3d 676, 679 (9th Cir. 2005).

The Court may direct an award of benefits where "the record has been fully developed and further administrative proceedings would serve no useful purpose."*McCartey v. Massanari,* 298 F.3d 1072, 1076 (9th Cir. 2002) (citing *Smolen v. Chater,* 80 F.3d 1273, 1292 (9th Cir. 1996)).  The Court may find that this occurs when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting the claimant's evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled if he considered the claimant's evidence.

*Id.* at 1076–77; *see also Harman v. Apfel,* 211 F.3d 1172, 1178 (9th Cir. 2000) (noting that erroneously rejected evidence may be credited when all three elements are met).

## II.    Sequential Analysis

This case involves reviewing the ALJ's materiality determination.[18]  Based on the weight of the medical opinions, the ALJ concluded that the Plaintiff's subjective complaints were greater than the objective findings and not consistent with the objective medical evidence.  At the time of the ALJ decision, on September 22, 2011, Plaintiff was 48 years old, a younger individual according to the Medical-Vocational Guidelines.  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.00(h)(1).[19]  Plaintiff

---

[18] AR 13-21.

[19]   (h)(1) The term *younger individual* is used to denote an individual age 18 through 49. For individuals who are age 45–49, age is a less advantageous factor for making an adjustment to other work than for those who are age 18–44. Accordingly, a finding of "disabled" is warranted for individuals age 45–49 who:

  (i) Are restricted to sedentary work,

  (ii) Are unskilled or have no transferable skills,

  (iii) Have no past relevant work or can no longer perform past relevant work, and

  (iv) Are unable to communicate in English, or are able to speak and understand English but are unable to read or write in English.

completed his GED and was able to communicate in English.  Plaintiff worked previously as a

general laborer, an unskilled job.

The first step of the ALJ's sequential analysis is not at issue.  Both Plaintiff and the

Commissioner agree that Plaintiff was not currently performing substantial gainful work.  *See* 20

C.F.R. § 416.920(a)(4)(i).

At Step Two, the ALJ determined that Plaintiff's medically determinable impairments were

low back pain, bilateral leg pain, major depressive disorder, and status post poly-substance

dependence.  However, the ALJ concluded that Plaintiff did not have an impairment or combination

of impairments that had significantly limited (or would be expected to significantly limit) the ability

to perform basic work-related activities for 12-consecutive months; therefore, Plaintiff did not have a

severe impairment or combination of impairments. *See* 20 CFR §§ 404.1521 *et seq*., 416.921 *et seq*.

On that basis, the ALJ decided that Plaintiff had not been under a disability, as defined in the Social

Security Act, from January 15, 2007, through the date of her decision.  *See* CFR §§ 404.1520(c),

416.920 (c).  After her step-two conclusion, the ALJ terminated her sequential analysis.

The ALJ did not proceed to assessing the claimant's RFC, the intermediate step between

steps three and four**.**  *See* 20 C.F.R. § 416.920(e).  At step four, the ALJ must determine whether, in

light of the claimant's RFC, he can return to substantial gainful activity performed in the past.  20

C.F.R. § 404.1520(e).  The ALJ did not perform a step-four analysis.  At step five, the

Commissioner must establish that the claimant is capable of performing substantial gainful work.

The ALJ did not proceed in a step-five analysis, although at the hearing she presented a hypothetical

RFC to the VE, who considered whether an individual burdened with the stated limitations could

obtain other gainful work in the economy.

Plaintiff challenges the ALJ's nondisability determination on the following bases: (1) the

ALJ's Step-Two findings and conclusion are not supported by substantial evidence because she

improperly weighed mental health providers' opinions; and, (2) the ALJ's failure to proceed in a full

five-step sequential analysis constitutes legal error because the case turns on whether Plaintiff is disabled, notwithstanding his history of DAA, and the ALJ should have determined the impact, if any, of DAA on Plaintiff's impairment.

### 1. Step-Two Findings and Conclusion

The ALJ found that Plaintiff had no severe mental impairments at Step Two, and determined that Plaintiff's RFC would not be impacted by his mental condition.  Plaintiff first contends that the ALJ improperly weighed the medical evidence at this step.

At Step Two, the burden is on a plaintiff to make a threshold showing that his medically determinable impairments significantly limit his ability to perform basic work activities.[20]  *See Bowen v. Yuckert,* 482 U.S. 137, 145, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *see also* 20 C.F.R. §§ 404.1520(c), 416.920(c).  To that end, "[a]n impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individual's ability to work.'"  *Smolen,* 80 F.3d at 1290 (quoting Social Security Ruling (SSR) 85–28).  Moreover, "the step two inquiry is a *de minimis* screening device to dispose of groundless claims." *Id.* (citing *Bowen v. Yuckert,* 482 U.S. 137, 153–54, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).  A claimant's own statement of symptoms alone is not enough to establish a medically determinable impairment. *See* 20 C.F.R. §§ 404.1508, 416.908.  To establish the existence of a medically determinable impairment, a plaintiff must provide medical evidence consisting of "signs—the results of 'medically acceptable clinical diagnostic techniques,' such as tests—as well as symptoms," a claimant's own perception or description of his physical or mental impairment. *Ukolov v. Barnhart,* 420 F.3d 1002, 1005 (9th Cir. 2005).

Here, at least one psychiatrist, one psychologist, one licensed clinical social worker, and two physicians each ran a series of tests or evaluated Plaintiff's mental state, and all diagnosed Plaintiff

---

[20] "Basic work activities" refers to "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b).

23

with varying degrees of depression or other mental impairments such as psychosis or schizophrenia. AR 286-90 (Gene Libunao, M.D.), AR  464-69 (Aparna Dixit, Psy. D.), AR 430-51 (David Sandoval, M.S.W., LCSW), AR at 456 (Yusufzie M.D.), AR at 270-80, 321-29, 401-02 (A. Garcia, M.D.).  There is no contradictory evidence on the record from any health professional indicating that Plaintiff did not have a mental disorder of some type.  While some medical or layman opinions can be accorded less weight, there is no medical evidence that supports the ALJ finding that the mental impairment claims does not surpass the *de minimis* screening threshold device to simply dispose of groundless claims.  In light of the complete absence of medical evidence contradicting the existence of mental impairments, the ALJ's step-two decision was erroneous because to find at step two that Plaintiff suffers from no severe mental impairments violates the standard of review of medical opinions set out in *Orn v. Astrue,* 495 F.3d 625, 631 (9th Cir. 2007).

Having found legal error, the Court must remand for further proceedings.

**2.  Failure to Properly Consider Relevant Evidence**

Where there is evidence of a mental impairment that allegedly prevents a claimant from working, the Social Security Administration has supplemented the five-step sequential evaluation process with additional regulations to assist the ALJ in determining the severity of the mental impairment. *Clayton v. Astrue,* 2011 WL 997144, at * 3 (E.D. Cal. Mar. 17, 2011) (citing 20 C.F.R. §§ 404.1520(a), 416.920(a).  These regulations provide a method for evaluating a claimant's pertinent symptoms, signs, and laboratory findings to determine whether the claimant has a medically determinable mental impairment. 20 C.F.R. § 404.1520(a).  In conducting this inquiry, the ALJ must consider all relevant and available clinical signs and laboratory findings, the effects of the claimant's symptoms, and how the claimant's functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment. 20 C.F.R. § 404.1520a(b).  The ALJ must tie the objective factors of the record as a whole to the opinions and findings that he or she rejects. *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).

24

Questions of credibility and resolution of conflicts in the testimony are functions solely of the Secretary. *Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996), *cert. denied*, 519 U.S. 1113 (1997). The ALJ must then assess the degree of the claimant's functional limitations based on the individual's impairments. 20 C.F.R. § 404.1520a(c).

### a.  Improperly Rejected Evidence from Licensed Clinical Social Worker ("LCSW")

Plaintiff contends that by the ALJ's failure to discuss the Licensed Clinical Social Worker David Sandoval's opinions, she improperly rejected them.  Defendant asserts that the ALJ provided germane reasons to reject Mr. Sandoval's opinion, or, in the alternative, the error was harmless.

An ALJ may reject the opinion from "other sources" who are not considered "an acceptable medical source" by providing germane reasons for doing so. *Turner v. Comm'r of the Soc. Sec. Admin.*, 613 F.3d 1217, 1223-24 (9th Cir. 2010).  Acceptable medical sources are found in 20 C.F.R. §§ 404.1513(a)(1)-(5), 416.913(a)(1)-(5), and other sources who are not acceptable medical sources are found in 20 C.F.R §§ 404.1513(d)(1)-(4), 416.913(d)(1)-(4).

The record contains extensive treatment notes about Plaintiff written by Mr. Sandoval, M.S.W., LCSW. [21]  The LCSW treated Plaintiff with counseling between approximately February 2010 and at least February 2011.  In the LCSW's February 2010 treatment notes, he diagnosed Plaintiff with "Substance Abuse Issues" and "Psychosis NOS."  By March 8, 2010, the LCSW had diagnosed Plaintiff with "Substance Abuse Alcohol Dependence 303.9."  Consistent with the July 23, 2010 sobriety date referenced by Dr. Dixit, the LCSW wrote in his October 2010 progress notes that Plaintiff had been sober several months and attended AA.  At that time, the LCSW listed Plaintiff's diagnosis as "Alcohol Dependence, 303.9," and "Alcohol induced psychosis."

---

[21] Licensing as an LCSW in California requires an MSW from an accredited social work program, as well as having completed 3,200 hours of supervised work experience, where at least 750 hours must be in psychotherapy and at least 2,000 hours must be in combined diagnosis, assessment, treatment, counseling, and psychotherapy. *See* National Association of Social Workers, California Chapter, available at http://www.naswca.org/?151 (accessed Sept. 29, 2014); *see also* Association of Social Work Boards, clinical requirements, available at http://www.aswb.org/licensees/about-licensing-and-regulation/ (accessed Sept. 29, 2014).

However, by November 2010, and again in December 2010, the LCSW changed his diagnosis to "Alcohol dependence in remission." And because Plaintiff's symptoms of psychosis had not diminished despite Plaintiff's sobriety, the LCSW again changed his diagnosis in his late December 2010 treatment notes. He had updated the diagnosis to "Psychosis" and "Depression." Then in January 2011, the LCSW retained that same diagnosis: "298.9 Psychosis, nos," and recommended that Plaintiff consult with Dr. Chua for additional treatment.

Finally, by the end of January 2011, the LCSW tracked Plaintiff's approximately six months' sobriety ("Alcohol dependence 303.9 in partial remission (6 months)"), and retained Plaintiff's diagnosis of "Psychosis NOS 298.9," finding DAA nonimpactful on this diagnosis. Indeed, the LCSW in February 2011 specifically noted that Plaintiff continued to hear voices and respond to internal stimuli despite Plaintiff's continued sobriety. Finally, in late February 2011, the LCSW last described Plaintiff's diagnoses as "303.90 Alcohol dependence in full remission," and "298.9 Psychosis, nos."

The LCSW had a year-long relationship with Plaintiff and his treatment notes are the only collected over a span which includes both a period of Plaintiff's alcohol use and sobriety. Indeed, the LCSW's notes are the only notes on the record collected by an individual treating mental health professional over *any* period. The other mental health records in the record are each from consultants who saw Plaintiff once: Dr. Libunao performed a psychiatric consultation on July 24, 2009, and Dr. Dixit performed her only psychological consultation on August 19, 2011. Dr. Garcia possibly met with Plaintiff twice, however, after each she determined that evidence was either "insufficient" to make a determination or she called for an additional assessment. In contrast, Mr. Sandoval counseled Plaintiff for over a year. All and still, the ALJ's discussion of the LCSW's opinions extended to merely one paragraph:

> The claimant attended counseling regularly with David Sandoval, LCSW from February 22, 2010 to February 9, 2011. As of January 21, 2011, the claimant had been sober for six

months. The claimant was last diagnosed with psychosis, not otherwise specified, and alcohol dependence in full remission.

Absent any justification for ignoring this evidence, the ALJ implicitly rejected it.  Certainly the ALJ may make credibility determinations between medical providers, but the ALJ must at least consider relevant evidence from an "other source." 20 C.F.R. § 404.1513(a)(1)-(5).  Mr. Sandoval's opinions are not due the same deference as a treating physician[22] because Mr. Sandoval is a licensed clinical social worker and, for purposes of Social Security Regulations, a licensed clinical social worker is considered an "other source."  *Id*.  Whatever the Commissioner's proffered justification now, it is improper because "[a]ccording to the Ninth Circuit, long standing principles of administrative law require us to review the ALJ's decision based on the reasoning and actual findings offered by the ALJ – not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226-27 (9th Cir. 2009) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196) (1947)).  By omitting any mention of Mr. Sandoval's opinion in her analysis, the ALJ rejected it and failed to give any germane reason for doing so.  That omission constitutes legal error.

### b.  Improperly Weighted Medical Source Evidence

Physicians render two types of opinions in disability cases: (1) clinical medical opinions regarding the nature of the claimant's impairments and (2) opinions on the claimant's ability to perform work.  *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  "An ALJ is not bound by an expert medical opinion on the ultimate question of disability." *Tomasetti*, 533 F.3d at 1041; SSR 96-5p.  Three types of physicians may offer opinions in social security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] not treat[ed] the claimant (nonexamining physicians)." *Lester*, 81 F.3d at 830.  A treating physician's opinion is generally

---

[22] A treating physician is employed to cure and has a greater opportunity to know and observe the patient.  *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987).

entitled to more weight than the opinion of a doctor who examined but did not treat the claimant.[23]

*Id.* The corollary is that an *examining* physician's opinion is generally entitled to more weight than that of a nontreating physician. *Lester*, 81 F.3d at 830 (emphasis added).

An ALJ must determine a claimant's RFC based on "all relevant evidence in the record." *Valentine v. Commissioner of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009). The ALJ must set forth a detailed and thorough factual summary, address conflicting clinical evidence, interpret the evidence and make a finding. *Magallanes*, 881 F.2d at 751-55. The ALJ need not give weight to a conclusory opinion supported by minimal clinical findings. *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999); *Magallanes*, 881 F.2d at 751. Although an ALJ is not bound by uncontroverted opinions rendered by a plaintiff's physicians regarding the ultimate issue of disability, he or she cannot reject them out of hand, but must set forth clear and convincing reasons for rejecting them. *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993).

Where an examining physician's opinion is uncontradicted by another doctor, the ALJ must provide "clear and convincing" reasons for rejecting that physician's ultimate conclusions. *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993). The ALJ must tie the objective factors of the record as a whole to the opinions and findings that she rejects. *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988). Questions of credibility and resolution of conflicts in the testimony are functions solely of the Secretary. *Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996), *cert. denied*, 519 U.S. 1113 (1997).

Here, the ALJ was required to set forth specific clear and convincing reasons for rejecting the opinion of the uncontradicted consultative and state physicians. The ALJ recognized that there was consensus between the consultative physicians that Plaintiff had mental health impairments that

---

[23] The Social Security Administration favors the opinion of a treating physician over that of nontreating physicians. 20 C.F.R. § 404.1527; *Orn*, 495 F.3d at 631. Nonetheless, a treating physician's opinion is not conclusive as to either a physical condition or the ultimate issue of disability. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

affected whether he was able to perform a range of unskilled work, with only some differences in the

degree of specific function-by-function limitations.

### i.  Psychiatrist Dr. Libunao's Medical Opinion

In her decision, the ALJ acknowledged that Dr. Libunao opined the following:

> [T]he claimant was incapable of managing his own funds.  The doctor found that the claimant was able to perform simple and repetitive tasks, but not detailed and complex tasks.  Dr. Libunao found that the claimant was unable to accept instructions from supervisors and interact with coworkers and the public, perform work activities on a consistent basis without special or additional instruction, and maintain regular attendance in the work place.  In addition, the doctor found the claimant unable to complete a normal workday or workweek without interruptions from a psychiatric condition and deal with the usual stress encountered in a competitive work environment.

But without clear and convincing reasoning, the ALJ determined that Dr. Libunao's opinions

deserved "reduced weight":

> Dr. Libunao's opinion is given reduced weight because the doctor's mental functional capacity assessment was based upon the claimant's alcohol use, which is no longer material since the claimant testified that he quit on July 23, 2010.

In support of her findings, the ALJ suggests that, by his note that the claimant's medical condition

"could improve within twelve months with treatment," Dr. Libunao implied that "the doctor did not

consider the claimant's mental impairments to be severe as they likely would not meet the duration

requirement with proper treatment."  The ALJ did not point to contradictory evidence.

However, the ALJ does not supply, and the Court cannot find, any statement by Dr. Libunao

in his report pointing to causation between treatment and an impact on the severity of Plaintiff's

limitations.  The doctor's treatment comment is on a different page, in a different section, and under

a separate heading than his limitation assessment, and he makes no statement linking them.

Moreover, upon review of Dr. Libunao's evaluation, the Court finds that he made no statement

attributing his functional assessment to Plaintiff's alcohol use.  Although the Court cannot speculate

as to the extent this incorrect finding affected the ALJ's weighting of Dr. Libunao's opinion, the ALJ

stated it was the primary reason for giving the opinion reduced weight in her assessment of the severity of Plaintiff's mental impairments.

This error in the factual basis of the ALJ's analysis is prejudicial to the Plaintiff and not supported by substantial evidence.  Therefore, the entirety of the ALJ's justification for discounting Dr. Libunao's opinions as to Plaintiff's functional limitations relies on unsupported speculation.  Unsupported speculation is not a reasonable justification for discounting a medical opinion from an examining physician.  Consequently, absent from the ALJ's analysis is any reasonable justification for rejecting the examining psychiatrist's assessment of Plaintiff's limitations in favor of the ALJ's interpretation.

### ii.    Physician Dr. Yusufzie's Medical Opinion

The ALJ gave "great weight" to Dr. Yusufzie's opinions from August 2011 because "it is supported by the findings during the doctor's examination and is consistent with the medical record taken as a whole.  Additionally, the doctor examined the claimant in-person and wrote a thorough report of the findings."   All and still, the ALJ failed to consider in the weight of the evidence the doctor's diagnosis of "Schizophrenia, actively psychotic, hearing voices," which tends to support the opinions of all other examining doctors and treating professionals.[24]  Significantly, Dr. Yusufzie made her assessment during Plaintiff's period of sobriety after July 2010, and just days before Dr. Dixit's consultation.  Taken together with Dr. Libunao and the LCSW's opinion, the balance shifts to support the proposition that Plaintiff has severe mental limitations.

The Court finds that the given justifications do not rise to the requisite level of specificity and clarity to reject uncontradicted medical opinions.  Nor do they rise to the level of specific and

---

[24] The ALJ gave "great weight" to Dr. Yusufzie's opinions from August 2011 because "it is supported by the findings during the doctor's examination and is consistent with the medical record taken as a whole.  Additionally, the doctor examined the claimant in-person and wrote a thorough report of the findings."

1  legitimate reasons required for the ALJ to reject conflicting opinions between examining physicians.

2  These omissions constitute legal error.

3  **III.    Harmless Error**

4      An error may be considered harmless where it "occurred during an unnecessary exercise or

5  procedure;" is nonprejudicial to the plaintiff; is considered irrelevant to the determination of

6  nondisability; or if the reviewing court can "confidently conclude" that no reasonable ALJ could

7  have reached a different disability determination if erroneously disregarded testimony was credited.

8  9  *See Stout v. Comm'r. Soc. Sec. Admin.*, 454 F.3d 1050, 1056 (9th Cir. 2006).

10      The ALJ acknowledged that Plaintiff testified that he began his sobriety on July 23, 2010.

11  The significance of that date renders a comparative analysis of the mental health evidence before and

12  after that date highly relevant to this disability determination.  Yet the ALJ rejected a longitudinal

13  assessment of Plaintiff's mental condition by the one professional who knew him best over the span

14  15  of time that the ALJ considered the most relevant: post-July 2010, the start of Plaintiff's sobriety.

16  Instead, the ALJ gave "great weight" to Dr. Dixit's opinion, and did so in part because "the doctor

17  reviewed the entire record."  This is incorrect.  On the face of her evaluation Dr. Dixit wrote that she

18  had reviewed only Dr. Libunao's evaluation from 2009, a mere sliver of the record at the time of Dr.

19  Dixit's consultation in August 2011.  The ALJ further justified her reliance on Dr. Dixit's opinion on

20  the basis that the opinion was consistent with the longitudinal evidence.  Not so.  Although it is not

21  22  entirely clear to what Dr. Dixit was referring when she wrote, "there was no evidence of psychosis,"

23  the record illustrates that another examining doctor and a licensed clinical social worker opined that

24  there *was* evidence of psychosis.  By August 2011, Dr. Yusufzie and the LCSW had diagnosed

25  Plaintiff as "actively psychotic," and "Psychotic," respectively.

26      Additionally, in contrast to the ALJ's *pro forma* statement that Dr. Dixit "wrote a thorough

27  report of the findings," the report includes multiple conclusory statements such as "claimant will

28  have no significant difficulty interacting and relating to co-workers and supervisors," but gives no

supporting details supporting that conclusion.  The weight of the evidence directly contradicts Dr. Dixit's report, upon which the ALJ hangs her hat.  In the face of the substantial, consistent, and corroborative evidence in the record from Dr. Libunao, Dr. Yusufzie, and the disregarded evidence from the LCSW, the Court cannot say that a reasonable ALJ would not have reached a different conclusion at Step Two if the erroneously disregarded testimony was credited.  Accordingly, improperly weighing the opinion evidence was not harmless error.  *See Stout*, 454 F.3d at1056.

## IV.    Consideration of Drug Abuse and Alcoholism ("DAA")

Plaintiff contends the ALJ erroneously circumvented the proper process for evaluating DAA under *Bustamante v. Massanari*. *See* 262 F.3d 949, 955 (9th Cir. 2001) (holding that where alcohol or drug abuse are implicated in a disability proceeding, an ALJ must first conduct the five-step inquiry without separating out the impact of DAA).  If the ALJ finds the claimant is not disabled under the five-step inquiry, then the claimant is not entitled to benefits and there is no need to proceed with the analysis regarding DAA under 20 C.F.R. §§ 404.1535 or 416.935. *Id.*  On the other hand, if the ALJ finds the claimant is disabled and there is medical evidence of the claimant's drug addiction or alcoholism, then the ALJ should then determine if the claimant would still be found disabled if the claimant stopped using alcohol or drugs. *Id.*  If the remaining limitations would not be disabling, then the claimant's substance abuse is material and benefits must be denied. *Parra v. Astrue,* 481 F.3d 742, 747–48 (9th Cir. 2007).

The parties agree alcohol and drug abuse are implicated.  The mental health professionals involved consistently report that Plaintiff has a history of DAA.  Yet, depending on the date of examination, doctors differ in their assessment of the severity and source of Plaintiff's mental impairments.  Plaintiff argues that the ALJ did not properly address the issue because she considered Plaintiff's alcoholism in making her nondisability determination at Step Two of the sequential analysis, but failed to engage the appropriate DAA analysis that *Massanari* requires.  In contrast, the Commissioner argues the ALJ properly reached her step-two conclusion considering all of Plaintiff's

impairments, including alcoholism, and therefore did not need to determine the DAA analysis of whether he would still be found disabled absent DAA.

The Court agrees that the ALJ failed to follow *Massanari*.  The ALJ improperly engaged in a five-step inquiry where she considered the impact of Plaintiff's substance abuse and stopped at Step Two.  This is evidenced by the ALJ's decision to discount Dr. Libunao's opinions because his assessment was "based on Plaintiff's alcohol use."  Dr. Libunao did state that Plaintiff's condition was treatable and implied that treatment may decrease the severity of Plaintiff's mental health impairment, but he did not indicate that alcohol abuse instigated Plaintiff's mental health condition and did not specify whether or to what extent Plaintiff's limitations were attributable to DAA.  Dr. Dixit also diagnosed Plaintiff with "Major Depressive Disorder, NOS," opined that Plaintiff would "benefit from psychiatric treatment," and hand-wrote in her medical source statement that DAA "may or may not have impacted his reported psychosis."  The doctors' opinions are consistent.

The ALJ erred by failing to parse the impact of DAA on Plaintiff's impairments and instead considered the effect of Plaintiff's DAA in her initial pass at the sequential analysis.  As discussed above, the record illustrates that Plaintiff suffered from mental impairments such that he met the *de minimis* burden to show a severe impairment at Step Two.  Thus, the ALJ erroneously and prematurely ended her analysis without following the appropriate steps to determine the impact of Plaintiff's admitted alcoholism on his other impairments.  Only after a complete five-step inquiry led to a disability determination should the ALJ have evaluated whether Plaintiff was disabled absent DAA. *Bustamante*, 262 F.3d at 955.  By proceeding in full consideration of the impact of DAA on Plaintiff's limitations, the ALJ's analysis constitutes legal error.

The Commissioner's argument fails because, notwithstanding the ALJ's given reasons for rejecting the opinions of the LCSW and Dr. Yusufzie and discounting Dr. Libunao's opinions, she did so primarily on the basis that the mental health professionals based their opinions on Plaintiff's alcoholism.  In other words, she considered its effect from the outset.  The Commissioner's

justification cuts against the argument that the ALJ properly applied the five step disability inquiry without attempting to determine the impact of Plaintiff's DAA on his other impairments.

In sum, although DAA was a major factor in the ALJ's disability determination, the ALJ erred by failing to apply the Commissioner's regulations and the law of this Circuit which requires the ALJ to apply a two-step DAA analysis. The matter should thus be remanded with direction that the ALJ complete the initial five step disability inquiry pursuant to *Bustamante.*

## V.    REMAND

This Court has discretion to reverse and remand this case for further administrative proceedings or for an immediate award of benefits. *See* 42 U.S.C. 405(g) (sentence four); *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002).  "[R]emand for further proceedings is unnecessary if the record is fully developed and it is clear from the record that the ALJ would be required to award benefits." *Holohan v. Massanari*, 246 F.3d 1195, 1210 (9th Cir. 2001).

At bottom, there are three errors that require attention on remand.  First, the ALJ erroneously proceeded in a five-step inquiry in consideration of Plaintiff's DAA, contrary to the standards set forth by the Ninth Circuit.  *Bustamante*, 262 F.3d at 955.  Compounding that error, because Plaintiff met his *de minimis* burden to show a severe mental impairment at Step Two, the ALJ's step-two findings and conclusions were erroneous.  Third, the ALJ failed to justify rejecting Dr. Yusufzie and Mr. Sandoval's opinions, and had insufficient support for discounting Dr. Libuano's opinions, therefore, she improperly weighted the opinions of medical sources and laymen.

In *Smolen v. Chater,* the Ninth Circuit held that evidence should be credited and an action remanded for an immediate award of benefits when the following three factors are satisfied: (1) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. 80 F.3d 1273, 1292 (9th Cir. 1996); *see Varney v. Sec. of Health & Human Servs.*,

859 F.2d 1396, 1400 (9th Cir. 1988) ("In cases where there are no outstanding issues that must be resolved before a proper determination can be made, and where it is clear from the record that the ALJ would be required to award benefits if the claimant's excess pain testimony were credited, we will not remand solely to allow the ALJ to make specific findings regarding that testimony."); *Swenson v. Sullivan,* 876 F.2d 683, 689 (9th Cir. 1989) (same); *Rodriguez v. Bowen,* 876 F.2d 759, 763 (9th Cir. 1989) ("In a recent case where the ALJ failed to provide clear and convincing reasons for discounting the opinion of claimant's treating physician, we accepted the physician's uncontradicted testimony as true and awarded benefits.") (citing *Winans v. Bowen,* 853 F.2d 643, 647 (9th Cir. 1988)); *Hammock v. Bowen,* 879 F.2d 498, 503 (9th Cir. 1989) (extending *Varney II's* "credit as true" rule to a case with outstanding issues where the claimant already had experienced a long delay and a treating doctor supported the claimant's testimony).

Here, because the ALJ did not proffer legally sufficient reasons for rejecting or discounting the medical and laymen opinions outlined above, the Court credits those opinions as true. *See Lester v. Chater,* 81 F.3d 821, 834 (9th Cir. 1995) (the Ninth Circuit has favored the "credit as true" doctrine since *Varney* was decided); *Smolen,* 80 F.3d at 1292; *Reddick,* 157 F .3d at 729; *Harman v. Apfel,* 211 F.3d 1172, 1178 (9th Cir. 2000); *Moore v. Com'r of Soc. Sec.,* 278 F.3d 920, 926 (9th Cir. 2002); *McCartey v. Massanari,* 298 F.3d 1072, 1076–77 (9th Cir. 2002); *Moisa v. Barnhart,* 367 F.3d 882, 887 (9th Cir. 2004); *Benecke v. Barnhart,* 379 F.3d 587, 593–95 (9th Cir. 2004); *Orn,* 495 F.3d at 640; *Lingenfelter,* 504 F.3d at 1041.  Crediting the above opinions as true, Plaintiff is disabled based on the VE's testimony that a similarly capable individual could not perform any work.

The Court refrains from remanding for benefits because a severe impairment of depression or other mental impairment at Step Two does not necessarily translate into a finding of disability. *Parra,* 481 F.3d at 746 (citing *Bustamante,* 262 F.3d at 954)).  There exist outstanding issues to resolve before a determination of disability can be made, therefore, the Court will remand for further

1   proceedings so that the ALJ may conduct a proper DAA analysis to determine whether Plaintiff's

2   disabling limitations remain in the absence of alcohol use.  *See* U.S.C. § 423(d)(2)(C) ("an

3   individual shall not be considered disabled   . . . if alcoholism or drug addiction would . . . be a

4   contributing factor material to the Commissioner's decision that the individual is disabled").  After

5   conducting a DAA analysis, the Commissioner may deny or award benefits.

6   **VI.     CONCLUSION AND ORDER**

7           For the foregoing reasons, the Court finds that the ALJ's nondisability determination

8   includes legal error and is not supported by substantial evidence.  The Court will grant Plaintiff's

9
10  appeal, but a further hearing is required.  Accordingly,

11          **IT IS HEREBY ORDERED** that Plaintiff's appeal from the administrative decision of the

12  Commissioner of Social Security (Doc. 1) is **GRANTED**.

13          **IT IS FURTHER ORDERED** that pursuant to sentence four of 42 U.S.C. § 405(g), that the

14
15  matter is **REMANDED** for further proceedings consistent with this decision; and,

16          **IT IS FINALLY ORDERED** that the Clerk of Court is **DIRECTED** to enter judgment in

17  favor of Plaintiff, Rudy Almazan, and against Defendant Carolyn W. Colvin, Acting Commissioner

18  of Social Security, and shall **TERMINATE** this action.

19

20  IT IS SO ORDERED.

21      Dated:   **October 14, 2014**                  **/s/ Sandra M. Snyder**
22                                              UNITED STATES MAGISTRATE JUDGE

23

24

25

26

27

28